UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:12-00010

WILLIAM LEON RHODES

MEMORANDUM OPINION AND ORDER

        Pending is defendant William Leon Rhodes' motion to
dismiss the indictment filed March 20, 2012.

I.

        On November 13, 1990, Mr. Rhodes pled guilty in
the Circuit Court of Jackson County to grand larceny, a felony.
On February 27, 1991, following a 60-day evaluation period at
Huttonsville Correctional Center, Mr. Rhodes was sentenced to a
three-year term of probation.  On January 11, 2012, the United
States filed a three-count indictment charging Mr. Rhodes with
the possession of certain firearms on three separate dates,
namely, May 13, June 10, and July 16, 2007.  The indictment also
seeks the forfeiture of 20 firearms.

        As noted in its May 30, 2012, order, some uncertainties
appear in the evidentiary record developed by the parties hereto-

fore.  Having since reviewed the record anew, however, those
uncertainties do not impede resolution of the motion to dismiss.
The factual recitation found below is largely undisputed.  In
those few instances where disputes or uncertainties linger, they
are not material to the analysis.

On May 13, 2007, West Virginia State Trooper Fred
Hammack was in Spencer, West Virginia, investigating a stolen
truck.  He observed an individual urinating while standing
immediately outside a truck, the engine of which was running at
the time.  Mr. Rhodes was in the driver's seat.

Trooper Hammack spoke to Mr. Rhodes about the truck and
noticed the aroma of alcohol on Mr. Rhodes's breath.  Mr. Rhodes
advised that he was heading home.  Mr. Rhodes exited the vehicle
at Trooper Hammack's request.  Trooper Hammack asserts that a
beer bottle fell to the ground when Mr. Rhodes exited.  He then
apparently failed a field sobriety test and was taken into
custody.

Trooper Hammack first searched Mr. Rhodes's person.
That search allegedly yielded a vial of white powder, which
Trooper Hammack states was confirmed by Mr. Rhodes at the scene
to be methamphetamine.  Trooper Hammack then searched the truck
and found two loaded hand guns wrapped in a towel.  Mr. Rhodes

was charged with driving under the influence, possession of a controlled substance (less than 15 grams), and two counts of having loaded firearms in his vehicle.

On June 10, 2007, the Roane County 911 dispatch received a call from Mr. Rhodes's sister, who was perceived as being intoxicated at the time. She claimed that Mr. Rhodes was drunk and had assaulted her. Trooper Hammack responded to the call. While en route he saw Mr. Rhodes traveling in, but not driving, a truck. He accomplished a traffic stop. Trooper Hammack asserts that he observed Mr. Rhodes fidgeting with an item on the floorboard. He directed Rhodes to place his hands where they could be seen, after which Trooper Hammack asserts that he saw a loaded .357 revolver in Mr. Rhodes' possession. Mr. Rhodes asserted that he was unloading the weapon according to Trooper Hammack. A cross bow was also retrieved.

Mr. Rhodes was arrested and charged with possession of a concealed weapon. Trooper Hammack then ran a National Crime Information Center check on Mr. Rhodes. The check failed to indicate Mr. Rhodes had any prior felony convictions. Trooper Hammack also inquired with the Circuit Clerk of Roane County, who likewise reported no record showing Mr. Rhodes was previously convicted of a felony. When similar inquiry was made of the

Circuit Clerk of Jackson County, however, the 1990 grand larceny conviction was found.  Again, that conviction qualified as a felony under West Virginia law inasmuch as it was punishable by more than one year of imprisonment.  It is the only felony on Mr. Rhodes' record.

By July 11, 2007, Mr. Rhodes had apparently been released from custody on bond.  He contacted Trooper Hammack on that date.  He asked permission to retrieve his cross bow.  Mr. Rhodes later met Trooper Hammack at the Spencer State Police Detachment for that purpose.  Trooper Hammack asked Mr. Rhodes how he came to possess the firearms found during the June 10, 2007, search.  Mr. Rhodes stated that he had a safe full of firearms at home.

On July 16, 2007, Trooper Hammack applied for a search warrant for Mr. Rhodes' home.  He stated the following allegations in support:

> On May 13, 2007 . . . [Mr. Rhodes] was arrested for DUI
> and found to be in possession of two loaded pistols
> which were concealed in his vehicle. On June 10, 2007
> Mr. Rhodes was again arrested for a concealed weapon in
> his vehicle; another pistol. On July 11, 2007, Mr.
> Rhodes came to WVSP Spencer to claim personal property.
> After being [M]irandized, Mr. Rhodes stated that he had
> a safe full of guns at his home. Mr. Rhodes made a
> similar statement the first evening he was arrested.
> Deputy M.P. King of the Roane County Sheriff's Office
> had obtained information from Ms. Christie Rhodes that
> Mr. Rhodes possessed guns all over his home. An inquiry

> . . . [though] with Jackson County Circuit Clerk in
> Ripley, WV revealed that Mr. Rhodes was convicted of
> grand larceny and burglary in 1990.

(Jt. Stip. at 3-4).

A search warrant was issued the same day. Trooper
Hammack, along with Roane County Sheriff deputies, then proceeded
to execute the search warrant at Mr. Rhodes' home. Seventeen
firearms were seized. Sixteen were long guns. The remaining
firearm was a pistol found in the master bedroom. In all, four
or five of the firearms were loaded.

Mr. Rhodes has additional criminal charges and convic-
tions as follows, each of which qualify as misdemeanors:

| Charge Date | Offense | Disposition |
|---|---|---|
| 03/05/1999 | Battery | 08/31/1999: Pled no contest. |
| 03/16/1999 | Driving on a suspended or revoked license. | 08/31/1999: Pled guilty. |
| 12/08/2000 | DUI. | 09/19/2001: Convicted. |
| 12/08/2000 | Leaving the scene. | 09/19/2001: Convicted. |
| 02/24/2001 | Driving on a suspended or revoked license following a DUI. | 11/07/2001: Pled guilty. |
| 04/02/2001 | Illegal and open burning of refuse. | 04/13/2001: Fined. |
| 02/01/2003 | DUI -- second offense. | 03/28/2003: Pled no contest. |
| 04/23/2007 | Cruelty to animals (horses). | 06/23/2008: Convicted. |
| 06/11/2011 | Possession of controlled substance. | 09/09/2011: Pled no contest. |
| 06/11/2011 | Muffler noise | 09/09/2011: Pled no contest. |
| 09/27/2011 | DUI -- third offense. | Indictment pending. |
| 01/23/2012 | Truancy | No disposition presently. |

As noted, on January 11, 2012, the United States filed a three-count indictment that included forfeiture allegations. Counts One through Three charge Mr. Rhodes with the knowing possession of certain firearms after previously being convicted of a felony offense, namely the 1990 grand larceny charge, in violation of 18 U.S.C. 922(g)(1).

On March 20, 2012, Mr. Rhodes moved to dismiss the indictment. The substance of Mr. Rhodes' challenge is as follows:

> Being a nonviolent felon due to a 17 year[-]old convic-tion, and having been told by officers stopping him for other reasons that they could not find any disqualify-ing felony conviction in his criminal record, Mr. Rhodes submits that his prosecution in this matter violates protections afforded under the Second Amend-ment of the United States Constitution.

(Mot. at 1). Mr. Rhodes asserts that section 922(g)(1), as applied to him, is an unconstitutional deprivation of his right under the Second Amendment to possess firearms.[1]

---

[1]Mr. Rhodes additionally asserts the following argument in favor of dismissal:

> Subsequent to serving his sentence of probation, there was no NCIC record showing that Mr. Rhodes had sus-tained any felony conviction. While Mr. Rhodes signed certain documents as part of his 1990 case, he is not a lawyer and, at best, understood that he had a prior conviction for grand larceny. If state officials could not easily discern if he had a felony conviction rela-tive to his May and June 2007 stops and concealed weapons cases, why is it Mr. Rhodes was expected to?
> (continued...)

6

On January 25, 2012, Mr. Rhodes was granted pretrial release in this action.  Condition 8(o) of his release provides that he shall "refrain from . . . any . . . use of alcohol." (Order Setting Conds. of Release at 2).  On April 27, 2012, law enforcement responded to a possible domestic altercation at Mr. Rhodes' residence.  When they came upon Mr. Rhodes, they detected the scent of alcohol.  He voluntarily submitted to a breathalyzer test and registered a .113.

On April 30, 2012, he visited the Roane County Day Report Center for a urinalysis and another breathalyzer test.  He registered a .052.  On May 1, 2012, the Honorable Mary E. Stanley, United States Magistrate Judge, issued a warrant for defendant's arrest following receipt of the probation officer's petition on the matter.  On May 7, 2012, Mr. Rhodes' pretrial release was revoked, apparently based upon his failure to refrain from the use of alcohol.

_____

[1](...continued)
(Memo. in Supp. at 13).  The court deems this assertion as an attack on the mens rea element and not susceptible of determination on a motion to dismiss.

7

A.    The Governing Standard

          The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be in-fringed."  U.S. Const. Amend 2.  In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), the Supreme Court concluded "that the Second Amendment conferred an individual right to keep and bear arms."  <u>Id.</u> at 595.  The majority opinion hastened to add, however, that "the right was not unlimited, just as the First Amendment's right of free speech was not . . . ."  <u>Id.</u> at 626.

          While the Supreme Court rejected rational basis analy-sis as the appropriate means for adjudicating the constitutional-ity of regulatory restrictions imposed upon the Second Amendment right, it did not otherwise set the measure for judicial review. Our court of appeals, in <u>United States v. Chester</u>, 628 F.3d 673 (4th Cir. 2010), has now done so.  It has reaffirmed as much in decisions that have followed more recently.  <u>See</u>, <u>e.g.</u>, <u>United States v. Mahin</u>, 668 F.3d 119, 124 (4th Cir. 2012) (respecting a Second Amendment challenge to section 922(g)(8), which criminalizes possession of a firearm by one subject to a domestic

violence protective order); <u>United States  v. Carter</u>,
669 F.3d 411, 415 (4th Cir. 2012) (respecting a Second
Amendment challenge to section 922(g)(3), which criminalizes
possession of a firearm by one who is an unlawful user of, or
addicted to, any controlled substance); <u>United States v. Staten</u>,
666 F.3d 154, 159 (4th Cir. 2011) (respecting a Second Amendment
challenge to section 922(g)(9), which criminalizes possession of
a firearm by one previously convicted of a misdemeanor crime of
domestic violence); <u>United States v. Chapman</u>, 666 F.3d 220, 225
(4th Cir. 2012) (respecting a Second Amendment challenge to
section 922(g)(8), which criminalizes possession of a firearm by
one subject to a domestic violence protective order).

   The <u>Chester</u> decision prescribed "a two-part approach to
Second Amendment claims" under <u>Heller</u>:

> The first question is "whether the challenged law
> imposes a burden on conduct falling within the scope of
> the Second Amendment's guarantee."  This historical
> inquiry seeks to determine whether the conduct at issue
> was understood to be within the scope of the right at
> the time of ratification.  If it was not, then the
> challenged law is valid.  If the challenged regulation
> burdens conduct that was within the scope of the Second
> Amendment as historically understood, then we move to
> the second step of applying an appropriate form of
> means-end scrutiny.  <u>Heller</u> left open the issue of the
> standard of review, rejecting only rational-basis
> review.  Accordingly, unless the conduct at issue is
> not protected by the Second Amendment at all, the
> Government bears the burden of justifying the constitu-
> tional validity of the law.

<u>Chester</u>, 628 F.3d at 680 (citations omitted).

At step one, as in <u>Chester</u>, it is often assumed that defendant "is entitled to <u>some measure</u> of Second Amendment protection to keep and possess firearms in his home for self-defense."  <u>Id.</u> at 681 (emphasis added).  A convicted felon, however, resides outside the core protections offered by the Second Amendment.  <u>See</u> <u>United States v. Moore</u>, 666 F.3d 313, 319 (4th Cir. 2012) ("Moore simply does not fall within the category of citizens to which the <u>Heller</u> court ascribed the Second Amend-ment protection of 'the right of law-abiding responsible citizens to use arms in defense of hearth and home.'") (citation omitted).

    For individuals like defendant, who are "not within the core right identified in <u>Heller</u>," the panel settled on the following formulation of means-ends analysis: "[T]he government must demonstrate under the intermediate scrutiny standard that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective."  <u>Id.</u> at 683 (quoted sources omitted).  In the recent <u>Moore</u> decision, the court of appeals noted that it had "no difficulty in concluding that § 922(g)(1) is constitutionally valid <u>on its face</u>" pursuant to this governing standard.  <u>Moore</u>, 666 F.3d at 319 (emphasis added).  As-applied challenges are subject to the same two-part <u>Chester</u> test.  <u>See</u>, <u>e.g.</u>, <u>United States v. Chapman</u>, 666 F.3d 220,

225 (4th Cir. 2012) ("We analyze Chapman's as-applied Second Amendment challenge to § 922(g)(8) under a two-part approach.").

There is a material difference, however, in the Chester-based analysis of section 922(g)(1) challenges compared with similar attacks on the proscriptions found in some of the remaining subdivisions.  This is so inasmuch as section 922(g)(1) has been deemed a "presumptively lawful regulatory measure[] . . . ."  District of Columbia v. Heller, 554 U.S. 570, 626 & n.6 (2008).

This carve out from Heller prompted the panel in Moore to observe that "the Chester analysis is more streamlined when a presumptively lawful regulatory measure is under review."  Id. at 318 (emphasis added).  The first difference in this streamlined review arises respecting allocation of the burden of proof, which is placed upon the defendant.  For example, the Moore defendant was required to "rebut the presumptive lawfulness of § 922(g)(1) as applied to him."  Id. at 320.  The court of appeals elaborated upon the Moore defendant's failure to discharge his burden:

> We do not foreclose the possibility that a case might exist in which an as-applied Second Amendment challenge to § 922(g)(1) could succeed. But while we acknowledge such a showing theoretically could be made, Moore is not remotely close. As we just noted, Moore undoubtedly flunks the "law-abiding responsible citizen" requirement. Moreover, Moore's proffered reason for possessing a firearm, "his fear of being robbed, such robberies being prevalent in the neighborhood in which he lived"

> is far too vague and unsubstantiated to remove his case
> from the typical felon in possession case.

<u>Id.</u> at 320.

  The second difference in streamlined review arises from

the more relaxed contours of the as-applied analysis in the

section 922(g)(1) setting, as illustrated in <u>Moore</u>:

> [T]he Supreme Court's declaration in <u>Heller</u> that felon
> in possession statutes are "presumptively lawful regu-
> latory measures" reinforces the fact that a litigant
> claiming an otherwise constitutional enactment is
> invalid as applied to him <u>must show that his factual
> circumstances remove his challenge from the realm of
> ordinary challenges</u>.
>
>   . . . .
>
>   However the Supreme Court may come to define a
> "law-abiding responsible citizen" for Second Amendment
> purposes, Moore surely would not fall within that
> group. Most notably, Moore's three prior felony convic-
> tions for common law robbery and two prior convictions
> for assault with a deadly weapon on a government offi-
> cial clearly demonstrate that he is <u>far</u> from a
> law-abiding, responsible citizen.
>
> Particularly in light of his extensive and violent
> criminal history, Moore's conduct here is <u>plainly
> outside</u> the scope of the Second Amendment.

<u>Moore</u>, 666 F.3d at 319-20 (citations omitted)(emphasis added).

B.  Analysis

  Mr. Rhodes' as-applied challenge is not without sub-

stance. Our court of appeals, and others, have suggested the

12

possibility that a single, well-aged felony might warrant relief
from the burden imposed by section 922(g)(1).  See, e.g., Carter,
669 F.3d at 418 (noting the necessity in Chester of developing a
thorough evidentiary record inasmuch as the statute in that
action, section 922(g)(9), "permanently disarms anyone convicted
of a misdemeanor crime of domestic violence, even if the defen-
dant has only one remote conviction."); United States v. Barton,
633 F.3d 168, 174 (3rd Cir. 2011) (suggesting that "a felon
convicted of a minor, non-violent crime might show that he is no
more dangerous than a typical law-abiding citizen.  Similarly, a
court might find that a felon whose crime of conviction is
decades-old poses no continuing threat to society."); United
States v. Williams, 616 F.3d 685, 693 (7th Cir. 2010); Britt v.
State, 363 N.C. 546, 681 S.E.2d 320 (2009) (finding that felon
convicted in 1979 of one count of possession of a controlled
substance with intent to distribute had a constitutional right to
keep and bear arms as that right is understood under the North
Carolina Constitution).

It is also the case that Mr. Rhodes' lone felony
conviction from 1990 distinguishes his circumstances from those
of the Moore defendant, whose criminal history was violent and
comparatively more serious.  It is a stretch to conclude, how-
ever, that Mr. Rhodes' circumstances are so far removed from the

realm of ordinary challenges to the statute's application that he should receive a constitutional restoration of his firearm privileges.  First, Mr. Rhodes' convictions for driving on a suspended or revoked license (twice), and leaving the scene, reflect a studied disregard for the trust society reposes in those to whom the privilege of driving is granted.  He has also violated a condition of his pretrial release.  His release represented a significant opportunity to demonstrate an ability to follow the law prior to resolution of the serious charges pending against him.  In failing to satisfy the expectations of both society and the court on these occasions, Mr. Rhodes has demonstrated a profound inability to adhere to law abiding standards.

Second, his convictions for DUI (twice), with another charged as recently as September 2011, suggest a similar disdain for public trust.  They also disclose a propensity to put public safety at risk in order to facilitate a poorly controlled habit of using alcohol to excess.  The no-contest plea for possession of a controlled substance just last year raises concerns too. See United States v. Carter, 669 F.3d at 418 ("In developing its record in this case, the government has chosen not to rely on academic research or other empirical data to demonstrate the connection between drug use and gun violence, even though such

evidence is abundantly available."). There is also the battery conviction, which raises additional concerns respecting Mr. Rhodes' ability to act peaceably.

All of these considerations are significant, as expressed in Carter:

> The weight of the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right. Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous.

Carter, 669 F.3d at 415 (citation omitted).

Mr. Rhodes attempts to minimize his frequent encounters with law enforcement as simple misdemeanors. The decision in Moore, however, does not discount misdemeanors or, for that matter, dismissed charges:

> Moore's criminal record is extensive, resulting in a total of 19 criminal history points as reflected in his Presentence Investigation Report. In addition to his felony convictions, he has numerous additional non-felony convictions as an adult including assault, assault and battery, assault on a government official, second-degree trespass, carrying a concealed gun, and various drug and driving-related offenses. In total, he has been convicted of more than twenty offenses and arrested more than twenty other times for charges that did not lead to convictions, generally because they were dismissed.

Id. at 315 n.1.

Mr. Rhodes also stresses that his criminal history does not reflect a predisposition toward violence.  Nevertheless, there is some doubt that an as-applied challenge will succeed in this circuit even when a defendant's prior convictions are nonviolent.  See United States v. Lunsford, No. 11-4776, 2012 WL 989568, at *1 (4th Cir. Mar. 26, 2012) ("In United States v. Moore, 666 F.3d 313, 316–17 (4th Cir. 2012), we held that '§ 922(g)(1) [is] a constitutionally valid statute.' While we left open the possibility of a successful as-applied challenge, we noted that the Moore defendant did not fall within the category of 'law-abiding responsible' citizens that the Second Amendment protects.  Similarly, Lunsford has a record of felony convictions for uttering, grand theft of a motor vehicle, and delivery of hydrocodone.  Like the defendant in Moore, and notwithstanding his limited mobility and any difficulty he may have in defending himself, Lunsford's criminal history places him outside of the category of non-violent, law-abiding citizens protected by the Second Amendment.")

Assuming Lunsford is properly disregarded, and that the battery conviction is deemed remote or inapplicable, it is the case that one could not justifiably classify Mr. Rhodes as a violent offender.  While he has DUI convictions for instance, they do not qualify as crimes of violence.  See Begay v. United States, 553 U.S. 137 (2008).  Nevertheless, the decision in Begay

observed that a DUI reflects "a degree of callousness toward risk . . . ." Id. at 146, 147 ("The distinction we make does not minimize the seriousness of the risks attached to driving under the influence. Nor does our argument deny that an individual with a criminal history of DUI might later pull the trigger of a gun."); see also Mahin, 668 F.3d at 125 (noting the capacity of alcohol to "inflame[]" a domestic violence incident). That is no small matter.

While one might confidently say Mr. Rhodes is not an individual predisposed to sustained violence, it is another matter to suggest that he is neither dangerous nor risky from a gun-possession perspective. A habitual criminal need not be violent in order to be dangerous. While Congress at one time only dispossessed violent felons of their right to bear firearms, that position changed decades ago in 1961. See An Act to Strengthen the Federal Firearms Act, Pub.L. No. 87-342, 75 Stat. 757 (1961). The change was designed in part, according to the United States Court of Appeals for the Third Circuit, "to 'keep firearms out of the hands of presumptively 'risky people . . . .'" United States v. Barton, 633 F.3d 168, 173 (3rd Cir. 2011)(quoting United States v. Bass, 404 U.S. 336, 345 (1971)).

Given his predisposition to disobey the law, and at times to put others in jeopardy while doing so, Mr. Rhodes has

failed to rebut the presumptive lawfulness of § 922(g)(1) as applied to him. His lengthy criminal history, while not indicative of sustained violence, is certainly inconsistent with the status of a law-abiding responsible citizen.

Mr. Rhodes will doubtless contest the view that he is either dangerous or risky from a gun-possession standpoint. Without further elaboration from the Supreme Court, however, a district court reviewing a firearm restriction is well advised to tread lightly, as noted in <u>United States v. Masciandaro</u>, 638 F.3d 458 (4th Cir. 2011):

> This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the <u>Heller</u> Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.
>
> If ever there was an occasion for restraint, this would seem to be it. There is much to be said for a course of simple caution.

<u>Id.</u> at 475-76 (emphasis added). It is likewise not far-fetched to think that the Supreme Court or our court of appeals would construe section 922(g)(1) to have constitutional application to Mr. Rhodes in light of his repeated failures to conform his conduct to acceptable societal standards. He has a long record of lawlessness.

18

Based upon the foregoing discussion, Mr. Rhodes has failed to demonstrate that section 922(g)(1) is unconstitutional as applied to him. The court, accordingly, concludes that section 922(g)(1) is constitutional as applied to defendant.

The Clerk is directed to forward copies of this written opinion and order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

DATED: June 1, 2012

John T. Copenhaver, Jr.
United States District Judge